**IN THE UNITED STATES DISTRICT COURT
FOR THE NORTHERN DISTRICT OF ILLINOIS
EASTERN DIVISION**

| | | |
|---|---|---|
| **UNITED STATES OF AMERICA,** | ) | |
| | ) | |
| **Plaintiff,** | ) | **16 CR 51** |
| | ) | |
| **v.** | ) | **Judge John Z. Lee** |
| | ) | |
| **RICARDO AGUIRRE,** | ) | |
| | ) | |
| **Defendant.** | ) | |

**MEMORANDUM OPINION AND ORDER**

On January 28, 2016, law enforcement agents found 18.3 kilograms of cocaine in the course of conducting a warrantless search of Defendant Ricardo Aguirre's car. Shortly thereafter, Aguirre was charged and indicted for possession of cocaine with intent to distribute in violation of 21 U.S.C. § 841(a)(1). Aguirre has now moved to suppress the physical evidence of the cocaine on the basis that it was obtained in violation of his Fourth Amendment rights. In addition, he has moved to suppress certain post-arrest statements that he made, contending that law enforcement agents improperly elicited the statements through false promises. The Court held an evidentiary hearing on the motion to suppress. For the reasons that follow, the motion is denied.

**Factual Background[1]**

On December 9, 2015, police officer John Pacewic ("Officer Pacewic") stopped a car in Elmhurst, Illinois, for committing a traffic violation. *See* Def.'s Mot. Suppress at 1–2, ECF No. 26. The car's occupants were Mario Ramirez-Guzman ("Guzman") and Jose Manuel Salazar-Rico ("Salazar"). *Id.* at 2. During the stop, Guzman and Salazar told Officer Pacewic

---

[1] The following facts are based upon the representations in the parties' briefs and the evidence presented at the hearing on June 8, 2017. The facts are undisputed except where otherwise noted.

that they were on their way to Mexico from a car auction in Harvey, Illinois. *See id.*; Gov't Resp. at 3, ECF No. 28. They explained that they traveled to the auction every two weeks, sleeping in their car and driving straight from Chicago to Mexico each time. Resp. at 3. They also told Officer Pacewic that the car they were driving belonged to their employer, Francisco Avila. *Id.*

Upon further investigation, Officer Pacewic and another law enforcement agent, Task Force Officer Victor Almaguer ("Officer Almaguer"), discovered that several of Guzman and Salazar's representations during the traffic stop appeared to be false. First, the officers learned that Guzman and Salazar's car was registered under the name "Jose M. Salzazar" [*sic*], rather than under the name "Francisco Avila." *Id.* Second, a license plate database query revealed that the car had been parked several times at a hotel in Joliet, Illinois, which appeared to be inconsistent with Guzman and Salazar's claim that they always slept in their car or drove straight through to Mexico. *See id.* at 4. The officers also developed doubts as to whether Guzman and Salazar had actually been traveling from Harvey to Mexico, given that Officer Pacewic had stopped them about thirty miles north of Harvey, rather than somewhere south of Harvey. *See id.* at 3–4.

After the traffic stop on December 9, 2015, Officer Almaguer contacted U.S. Immigration and Customs Enforcement (ICE) to further inquire into Guzman's background. *Id.* at 4. Officer Almaguer learned from ICE that Guzman had previously been stopped in El Paso, Texas, as an occupant of a vehicle containing a modified gas tank. *Id.* At the evidentiary hearing, Officer Almaguer testified that, based on his experience and training,[2] modified gas tanks are frequently used to transport contraband, narcotics, or narcotics proceeds.

---

[2] At the time of the evidentiary hearing, Officer Almaguer had worked as a detective for the Elmhurst Police Department for fourteen years and as a task force officer for the United States Drug Enforcement Administration (DEA) for three years. As a task force officer, Officer Almaguer has investigated narcotics cases by participating in undercover work, controlled buys, and surveillance.

In light of Guzman and Salazar's apparent misrepresentations to law enforcement agents, as well as the information obtained from ICE, Officer Almaguer and other agents began to suspect that Guzman and Salazar might be involved in drug trafficking or other illegal activity. *See id.* at 5; Def.'s Mot. at 1–3. Accordingly, the agents continued to surveil Guzman and Salazar over the course of the next several weeks. *See* Def.'s Mot. at 1–4. As part of these surveillance efforts, the agents obtained a court order permitting the installation of a pen register on Guzman's cell phone. *Id.* at 3.

During the early morning hours of January 28, 2016, the agents were tracking Guzman and Salazar in a black pickup truck. Def.'s Mot. at 4. The pickup was traveling northbound on an interstate toward Chicago, Illinois. *Id.* At 5:40 a.m., while it was still dark outside, agents saw the pickup park in a residential area near the intersection of 44th Street and Komensky Avenue in Chicago. *See id.*

Five minutes after the pickup had parked, Aguirre pulled up in a gray SUV and stopped behind the pickup. *Id.* Aguirre and Guzman then got out of the SUV and the pickup, respectively, and swapped places. *Id.* Specifically, Aguirre exited the driver's side of the SUV and entered the passenger's side of the pickup, while Guzman exited the passenger's side of the pickup and entered the driver's side of the SUV. *Id.* When Aguirre exited the SUV, he was carrying a white Gucci shopping bag. *Id.* It is unclear from the record whether Aguirre handed the shopping bag to Guzman before swapping cars with him, or whether Aguirre instead took the bag with him into the pickup.[3]

---

[3]     At the evidentiary hearing, one of the agents who observed this car swap testified that it was his understanding that the bag was exchanged, although he admitted that he could not remember who took the bag after Aguirre exited the SUV. In any event, the bag was later recovered from the pickup. In it was a pair of Gucci shoes. *See* Def.'s Mot. at 4–5.

After Aguirre and Guzman swapped places, the SUV and the pickup drove off in separate directions. *Id.* Agents lost track of the SUV, but they were able to maintain surveillance on the pickup (which, at the time, was occupied by Aguirre and Salazar). For about ten or fifteen minutes, agents surveilled the pickup as it turned down various roads in the vicinity of 44th Street. Resp. at 7–8. First, the pickup turned southbound off of 44th Street onto Karlow Avenue. *See id.* It then turned eastbound on 47th Street, northbound on Pulaski Road, eastbound on 46th Street, northbound on Avers Avenue, westbound on 45th Street, southbound on Springfield Avenue, westbound on 46th Street, southbound on Keeler Avenue, eastbound on 47th Street, and northbound on Kedvale Avenue. *Id.* Finally, the pickup turned eastbound back onto 44th Street. *Id.*; *see also id.*, Ex. A.

Officer Almaguer, who was one of the agents surveilling the pickup, later described the pickup's route as circuitous, testifying at the evidentiary hearing that the pickup appeared to be driving in circles. He further testified that, based on his training and experience, the pickup's route indicated that its occupants may have noticed the agents and were deliberately attempting to evade their surveillance. Officer Almaguer also identified such circuitous driving as a technique that narcotics traffickers sometimes use to thwart surveillance efforts.

Another agent on the surveillance team, Special Agent Billy Conrad ("Agent Conrad"), gave a similar description of the pickup's route. In particular, Agent Conrad testified that the pickup appeared to be conducting countersurveillance, given that it did not seem to be following a direct path to any particular destination. Agent Conrad also testified that, based on his experience as a narcotics investigator,[4] he believed that a driver might engage in such

---

[4] Agent Conrad has worked as a special agent for the DEA since 2004. He testified that he has participated in over a hundred narcotics investigations over the course of his career.

countersurveillance if the driver thought that police officers or other individuals were following or watching him.

After driving around the neighborhood for about ten or fifteen minutes, the pickup returned to its original location on 44th Street, as did the SUV. *See* Def.'s Mot. at 4. Aguirre and Guzman then re-swapped positions: Aguirre exited the passenger's side of the pickup and returned to the driver's side of the SUV, while Guzman exited the driver's side of the SUV and returned to the passenger's side of the pickup. *Id.* Both vehicles then drove away again, with agents close behind. *Id.*

At 6:10 a.m., agents conducted simultaneous stops of the SUV and the pickup. *Id.* at 4–5. The agents who stopped the SUV were Agent Conrad and Task Force Officer Rob Palos ("Officer Palos").[5] *Id.* at 5. As members of the surveillance team, Agent Conrad and Officer Palos both had knowledge of the two car swaps that had just taken place, as well as the circuitous route that the pickup had taken in between the swaps. *See* Resp. at 8 n.2. Additionally, Agent Conrad and Officer Palos both had knowledge of the underlying investigation into Guzman and Salazar. *Id.*

When Agent Conrad and Officer Palos stopped the SUV, it was on Pulaski Road, about to turn left onto an expressway. Aguirre was in the driver's seat, and a man named Salvador Navarro-Pamanes ("Navarro") was in the front passenger's seat. *See* Def.'s Mot. at 5. After signaling the SUV to pull over, Officer Palos approached the driver's side of the vehicle and

---

[5]     Officer Palos has worked as a police officer for the Brookfield Police Department for approximately eighteen years. He has been ranked as a sergeant since 2012. In addition, he served as a DEA task force officer from October 2010 to May 2017, and he has received training in narcotics investigations.

began speaking with Aguirre in Spanish.[6]  *Id.*  According to Officer Palos, he asked Aguirre to step out of the SUV and then asked whether Aguirre would consent to a search of the vehicle for drugs or narcotics.  Officer Palos claims that Aguirre responded by granting him permission to conduct a search.  Aguirre disputes this point, asserting in a terse affidavit that his consent to search the SUV was neither requested nor granted.  Aguirre Aff. ¶ 12, ECF No. 26-1 ("The officer did not ask me if he could search my vehicle at the time I was stopped, and I did not tell him he could search my vehicle.").[7]

After Aguirre exited the SUV, Officer Palos informed Agent Conrad that Aguirre had verbally consented to a search.  Officer Palos then proceeded to conduct a search of the vehicle while Aguirre stood nearby.[8]  In the SUV's rear compartment, Officer Palos found two five-gallon buckets labeled "O'Reilly's Motor Oil."  Upon shaking one of the buckets, he observed that the bucket seemed to contain a hard object, rather than oil or other fluid.  Officer Palos and another officer who had arrived at the scene then opened the buckets and found kilo-shaped packages containing a total of 18.3 kilograms of cocaine.  *See* Def.'s Mot. at 5.

Agent Conrad's testimony corroborated Officer Palos's description of the stop and search of the SUV.  At the hearing, Agent Conrad stated that he initially waited in a police van while Officer Palos approached the driver's side of the SUV to speak with Aguirre.  Shortly after Aguirre stepped out of the SUV, Agent Conrad exited the police van, motioned for Navarro to

---

[6]     Officer Palos is fluent in both English and Spanish.  Both of his parents speak Spanish, and he grew up speaking Spanish.  By contrast, Aguirre speaks Spanish but has only limited knowledge, if any, of English.

[7]     Aguirre did not testify at the evidentiary hearing.  As such, his affidavit contains his only sworn statements in the record.

[8]     Although Aguirre was handcuffed at some point later on, there is no evidence that he had already been handcuffed when Officer Palos began searching the SUV.

step out of the SUV, and handcuffed Navarro for officer safety. At that point, according to Agent Conrad, Officer Palos told him that Aguirre had verbally consented to a search of the vehicle. Agent Conrad then waited with Aguirre and Navarro near the rear of the SUV while Officer Palos conducted the search. Agent Conrad also testified that, shortly after Officer Palos found the buckets of cocaine, Aguirre and Navarro were placed under arrest and escorted into the police van.

Concerned about the busy traffic along Pulaski Road, Agent Conrad and Officer Palos drove Aguirre to a nearby parking lot at around 7:38 a.m. and read him his *Miranda* rights in Spanish. *See id.* at 5–6. Officer Palos later testified that Aguirre then signed a consent form giving written permission to search the SUV. Next, Aguirre initialed an advice-of-rights form to acknowledge that he had received notice of his *Miranda* rights. According to Officer Palos, Aguirre became nervous while initialing the advice-of-rights form and asked whether he was going to be in trouble. Officer Palos claims that, in response to this question, he told Aguirre he would advise the state's attorneys of Aguirre's cooperation with law enforcement if Aguirre did, in fact, cooperate. Aguirre then finished signing the advice-of-rights form.

Agent Conrad's description of the events in the parking lot was consistent with Officer Palos's. According to Agent Conrad, he learned at some point from Officer Palos that Aguirre was inquiring about benefits or guarantees for his cooperation. Agent Conrad told Officer Palos to ensure that Aguirre understood that no promises were being made and that only a judge could make a final determination regarding a prison sentence. After Agent Conrad and Officer Palos had this exchange, Officer Palos continued to speak with Aguirre in Spanish.[9]

---

[9]     Agent Conrad could not testify to the content of the conversations he overheard between Officer Palos and Aguirre, because the conversations were in Spanish and Agent Conrad is not a fluent Spanish speaker.

For his part, Aguirre describes the events in the parking lot somewhat differently. In his affidavit, he attests that an officer told him "he would talk to the judge if [Aguirre] signed the consent form." Aguirre Aff. ¶ 19. He avers that he then "signed the consent form based on the assistance [he] was offered." *Id.* Aguirre's affidavit makes no mention of the advice-of-rights form.

At around 8:38 a.m., after he had signed the consent form and the advice-of-rights form (both of which were presented at the evidentiary hearing), Aguirre provided Agent Conrad and Officer Palos with oral and written statements. In those statements, Aguirre admitted to possession of cocaine with intent to distribute. Resp. at 9–10. Based on these statements, as well as the evidence found during the search of Aguirre's vehicle, Aguirre was charged by criminal complaint on January 29, 2016, with possession of cocaine with intent to distribute in violation of 21 U.S.C. § 841(a)(1).

## Analysis

Aguirre has filed a motion to suppress all physical evidence of the cocaine found in his vehicle on January 28, 2016, maintaining that the evidence was discovered pursuant to a warrantless search in violation of his Fourth Amendment rights. In addition, he has moved to suppress evidence of his post-arrest statements, arguing that the statements were improperly elicited by false promises from law enforcement agents. For the reasons that follow, the Court rejects these arguments and denies Aguirre's motion to suppress.

## I. Motion to Suppress Physical Evidence of the Cocaine

The Fourth Amendment protects "[t]he right of the people to be secure in their persons, houses, papers, and effects[ ] against unreasonable searches and seizures." U.S. Const. amend. IV. As a general matter, a search is unreasonable under the Fourth Amendment if it is conducted in the absence of a warrant supported by probable cause. *See, e.g.*, *United States v. Parker*, 469

F.3d 1074, 1077 (7th Cir. 2006) (citing *Stanley v. Henson*, 337 F.3d 961, 963 (7th Cir. 2003)). In turn, when officers conduct a search that is unreasonable under the Fourth Amendment, the exclusionary rule generally requires suppression of any evidence obtained from the search. *See, e.g.*, *Utah v. Strieff*, 136 S. Ct. 2056, 2061 (2016); *United States v. McGraw*, 571 F.3d 624, 628 (7th Cir. 2009). There are, however, several well-established exceptions to these rules, two of which are of particular importance to this case.

First, the Fourth Amendment's warrant requirement does not apply when an authorized party voluntarily consents to a search. *Parker*, 469 F.3d at 1077. Consent that is given during an unlawful detention is presumed to be involuntary and therefore invalid. *United States v. Johnson*, 427 F.3d 1053, 1056 (7th Cir. 2005). But consent that is given during a lawful detention, such as an investigatory stop that is reasonably conducted and supported by reasonable suspicion, may be sufficient to permit a search. *See United States v. Figueroa-Espana*, 511 F.3d 696, 704–05 (7th Cir. 2007) (finding voluntary consent to permit a search where defendant gave consent during a lawful investigatory stop).

Second, officers need not obtain a warrant to conduct a search that falls within the "automobile exception" to the Fourth Amendment's warrant requirement. *United States v. Edwards*, 769 F.3d 509, 514 (7th Cir. 2014). Under the automobile exception, officers may conduct a warrantless search of a vehicle when they have probable cause to believe that the vehicle contains contraband or other evidence of criminal activity. *Id.*; *United States v. Zahursky*, 580 F.3d 515, 521 (7th Cir. 2009). Officers have probable cause to support a search under this exception where, "based on a totality of the circumstances[,] 'there is a fair probability that contraband or evidence of a crime will be found'" in the vehicle in question. *Zahursky*, 580 F.3d at 521 (quoting *Illinois v. Gates*, 462 U.S. 213, 238 (1983)).

Here, the Government offers two arguments as to why the agents' warrantless search of Aguirre's vehicle did not run afoul of the Fourth Amendment. First, the Government argues that the search was lawful because Aguirre voluntarily consented to the search during the course of a lawful investigatory stop supported by reasonable suspicion. In the alternative, the Government argues that the search would have been lawful even if Aguirre had not consented to it, because the search was supported by probable cause and thus fell within the automobile exception to the Fourth Amendment's warrant requirement.

## A.    Reasonable Suspicion and Voluntary Consent

### 1.    Reasonable Suspicion to Support the Stop of the SUV

The Fourth Amendment permits a law enforcement officer to conduct a warrantless investigatory stop—including a warrantless investigatory stop of a vehicle—when the officer reasonably suspects that a crime has occurred. *See D.Z. v. Buell*, 796 F.3d 749, 754 (7th Cir. 2015) (citing *Terry v. Ohio*, 392 U.S. 1, 21–22 (1968)); *United States v. Shields*, 789 F.3d 733, 744 (7th Cir. 2015). "Such stops, referred to as *Terry* stops, need not be supported by probable cause; rather, they are permissible as long as officers have a reasonable articulable suspicion that criminal activity is afoot." *D.Z.*, 796 F.3d at 754 (internal quotation marks omitted). Reasonable suspicion requires "only 'a minimal level of objective justification.'" *United States v. Hill*, 818 F.3d 289, 294 (7th Cir. 2016) (quoting *Illinois v. Wardlow*, 528 U.S. 119, 123 (2000)). To meet this requirement, an officer must have "more than a hunch" that a crime has occurred; "he must be able to point to specific facts that suggest that a stopped individual has committed, was committing, or is about to commit an offense." *D.Z.*, 796 F.3d at 754.

In determining whether an investigatory stop was supported by reasonable suspicion, courts consider the "totality of the circumstances" surrounding the stop. *Hill*, 818 F.3d at 294 (citing *United States v. Arvizu*, 534 U.S. 266, 273 (2002)). "Reasonable suspicion can arise from

behavior that may in other circumstances be considered innocent; in other words, context matters." *United States v. Ruiz*, 785 F.3d 1134, 1141 (7th Cir. 2015) (internal quotation marks omitted). Furthermore, although "an officer's subjective intent does not factor into this analysis," *D.Z.*, 796 F.3d at 754, courts may consider whether the officer's "own experience and specialized training" allowed him to "make inferences from and deductions about the cumulative information available." *Hill*, 818 F.3d at 294 (internal quotation marks omitted). "The government bears the burden of establishing reasonable suspicion by a preponderance of the evidence." *United States v. Uribe*, 709 F.3d 646, 650 (7th Cir. 2013).

When Agent Conrad and Officer Palos stopped Aguirre's vehicle, they had knowledge of numerous facts giving rise to reasonable articulable suspicion that Aguirre had committed or was in the process of committing a crime. Aguirre had just met Guzman and Salazar—who were already under investigation for suspected narcotics trafficking—during the predawn hours of the day in a residential area. While transferring items concealed in a bag, Aguirre then swapped cars with Guzman for no apparent reason. Once Aguirre had taken Guzman's place in the pickup truck, the pickup proceeded to drive along a circuitous route in the nearby area. Agent Conrad— an officer with over a decade of experience as a narcotics investigator—gave credible testimony that the pickup appeared to be performing countersurveillance in order to avoid detection by police officers or other individuals. This testimony was corroborated by the testimony of Officer Almaguer, who, like Agent Conrad, participated in the surveillance of the pickup and described the pickup's route as circuitous. After driving around the neighborhood for ten or fifteen minutes, the pickup returned to meet the SUV at the original meeting location. Aguirre and Guzman then re-swapped positions, again for no apparent legitimate reason.

Taken together, the time and location of Aguirre's meeting with Guzman and Salazar, the transfer of concealed items in Aguirre's bag, the two car swaps, and the pickup truck's circuitous driving were more than enough to create reasonable suspicion that Aguirre was engaged in a drug-related transaction with Guzman and Salazar. *See Ruiz*, 785 F.3d at 1141–42 (holding that officers had reasonable suspicion to support a *Terry* stop to investigate for narcotics where defendant entered the car of a drug-trafficking suspect, exited the car again a few minutes later, departed in a separate car, and drove in a manner indicative of an attempt to evade surveillance); *United States v. Lechuga*, 925 F.2d 1035, 1039 (7th Cir. 1991) (holding that officers had reasonable suspicion to support a *Terry* stop where defendant and another individual had a clandestine meeting in a parking lot, later emerged from an apartment holding two parcels containing concealed items, and drove in a manner indicative of countersurveillance). As such, based on their knowledge of these facts, Agent Conrad and Officer Palos had reasonable articulable suspicion to justify their stop of Aguirre's vehicle.[10]

## 2. Voluntary Consent to a Search of the SUV

Because Agent Conrad and Officer Palos had reasonable suspicion to support their stop of Aguirre, the question becomes whether Aguirre then gave them voluntary consent to search his vehicle. The Fourth Amendment permits officers to conduct a warrantless search upon receiving voluntary consent from an authorized person. *Parker*, 469 F.3d at 1077. "The

---

[10] In arguing that Agent Conrad and Officer Palos lacked reasonable suspicion to stop him, Aguirre relies primarily upon *United States v. Bohman*, 683 F.3d 861 (7th Cir. 2012). In *Bohman*, the Seventh Circuit held that officers did not have reasonable suspicion to stop a vehicle merely because the vehicle left a site that was suspected of housing a methamphetamine laboratory. *Id.* at 864–66. The court explained that "a mere suspicion of illegal activity about a place, without more, is not enough to justify stopping everyone emerging from that property." *Id.* at 864. Here, however, Agent Conrad and Officer Palos had more; they knew that Aguirre had personally engaged in activities that created reasonable articulable suspicion to justify a stop—namely, the two car swaps, the carrying of a concealed item out of the SUV, and the performance of countersurveillance. For these reasons, Aguirre's reliance on *Bohman* is unpersuasive.

government bears the burden of proving by a preponderance of the evidence that consent was freely and voluntarily given." *Figueroa-Espana*, 511 F.3d at 704.

Based on the evidentiary hearing and the parties' submissions, the Court concludes that the Government has carried its burden of proving that Aguirre voluntarily consented to a search of the SUV. First, Officer Palos credibly testified that Aguirre gave him verbal consent to search the SUV after he requested permission to check the vehicle for drugs or narcotics. There was no indication during the hearing that this testimony was untruthful; rather, based upon Officer Palos's tone and demeanor on the witness stand, the Court found his testimony to be honest and reliable. Furthermore, Officer Palos's credibility was bolstered by the fact that his testimony consistently matched Agent Conrad's description of the events in question.

Aguirre, of course, states in an affidavit that he never consented to a search of the SUV. *See* Aguirre Aff. ¶ 12. But the Court finds Aguirre's affidavit to be a less reliable source of evidence than Officer Palos's testimony. First, unlike Officer Palos's detailed testimony at the hearing, the statements in Aguirre's affidavit are sparse, self-serving, and generally lacking in specificity. In addition, and also in contrast with Officer Palos's testimony, Aguirre's statement regarding his consent to search the SUV remains uncorroborated by any other evidence presented at the hearing or otherwise provided to the Court. For these reasons, the Court discredits the statement in Aguirre's affidavit and concludes, based upon Officer Palos's credible, detailed, and corroborated testimony, that Aguirre gave verbal consent to a search of the SUV. *Cf. United States v. Sandoval-Vasquez*, 435 F.3d 739, 744–45 (7th Cir. 2006) (affirming district court's holding that defendant voluntarily consented to a search based upon district court's credibility determinations at suppression hearing); *United States v. Lanterman*, 76 F.3d 158, 162 (7th Cir. 1996) (holding that district court's fact findings were not clearly erroneous where they were

supported by credible testimony by officers and the officers' testimony was controverted only by defendant's "self-serving affidavit").

Next, the Court finds not only that Aguirre verbally consented to the search, but also that his consent was given voluntarily. "Whether consent is voluntary is a question of fact, dependent upon the totality of the circumstance." *Figueroa-Espana*, 511 F.3d at 704. In determining whether a person has given consent voluntarily, courts consider factors such as: "(1) the person's age, intelligence, and education; (2) whether he was advised of his constitutional rights; (3) how long he was detained before he gave his consent; (4) whether his consent was immediate, or was prompted by repeated requests by the authorities; (5) whether any physical coercion was used; and (6) whether the individual was in police custody when he gave his consent." *Id.* at 705 (citing *United States v. Santiago*, 428 F.3d 699, 704–05 (7th Cir. 2005)).

Here, Officer Palos testified that he had not advised Aguirre of his constitutional rights prior to requesting consent to search the SUV. Although this factor weighs against a finding of voluntariness, it is the only relevant factor that does so. Aguirre had been stopped for only a short period of time before Officer Palos requested consent to a search. Furthermore, Aguirre gave consent immediately upon Officer Palos's first request, rather than after repeated requests. Nothing in the record indicates that any physical coercion was used or that Aguirre was in police custody, handcuffed, or otherwise restrained at the time he consented to the search. Nor does anything in the record suggest that Aguirre's age, intelligence, education, or language-speaking skills impeded his ability to give voluntary consent. Given the totality of these circumstances, the Court finds that Aguirre voluntarily consented to the search of his vehicle. *See Figueroa-Espana*, 511 F.3d at 704–05 (holding that defendant voluntarily consented to a search of his

truck where he gave immediate consent upon request and where nothing in the record indicated that defendant was coerced or unable to understand the request).

In sum, based upon its review of the record, the Court finds that Agent Conrad and Officer Palos had reasonable articulable suspicion to stop Aguirre, and, once he had been stopped, Aguirre verbally consented to a search of his vehicle. Because this consent was given voluntarily during a lawful investigatory stop, the search did not violate Aguirre's rights under the Fourth Amendment. *See id.* Accordingly, Aguirre is not entitled to suppression of the physical evidence of the cocaine that was found during the search.

### B.    Probable Cause Under the Automobile Exception

Alternatively, the Government contends that even if Aguirre had not voluntarily consented to the search of his vehicle, the search would still have been lawful under the automobile exception to the Fourth Amendment's warrant requirement. Under the automobile exception, officers may conduct a warrantless search of a vehicle as long as there is probable cause to believe that the vehicle contains evidence of criminal activity. *United States v. Charles*, 801 F.3d 855, 860 (7th Cir. 2015) (citing *Arizona v. Gant*, 556 U.S. 332, 347 (2009)); *Edwards*, 769 F.3d at 514. Additionally, once officers have probable cause to support a warrantless search of a vehicle, "[t]he authority to search encompasses any area of the vehicle where evidence of the crime might be found." *Charles*, 801 F.3d at 860. In invoking the automobile exception, the Government bears the burden of showing by a preponderance of the evidence that the exception applies. *Zahursky*, 580 F.3d at 521.

Probable cause to support a search under the automobile exception exists when, based on the totality of the known facts and circumstances, a reasonably prudent person would believe that contraband or evidence of a crime will be found in the vehicle to be searched. *Charles*, 801 F.3d at 860; *United States v. Richards*, 719 F.3d 746, 754 (7th Cir. 2013). "Probable cause does not

require information sufficient to support conviction or even enough to show a preponderance of the evidence"; rather, "[a] fair probability of discovering contraband is enough." *Richards*, 719 F.3d at 754–55 (internal quotation marks omitted). In deciding whether officers had probable cause to support a search, the court must make "an objective determination [ ] without regard to an officer's motive, but with an eye toward additional knowledge the officer may have had as a result of his training and experience." *Charles*, 801 F.3d at 860 (citing *United States v. Reed*, 443 F.3d 600, 603 (7th Cir. 2006)).

Where officers observe a pattern of activities indicative of a drug transaction and having no apparent innocent explanation, probable cause exists to believe that a drug-related crime is underway. In this regard, the Seventh Circuit's decision in *United States v. Funches*, 327 F.3d 582 (7th Cir. 2003), is instructive. In *Funches*, the court held that experienced narcotics investigators had probable cause to conduct a warrantless arrest where they observed a meeting among the three defendants involving the use of an intermediary, relocation of vehicles, and exchange of concealed goods. *Id.* at 586–87. The court explained that these observations supported probable cause because experienced investigators would have recognized these events as characteristic of a drug transaction. *Id.* In addition, the court emphasized that "no innocent explanations [were] reasonably apparent" as to why the defendants had conducted their meeting in the way that they did. *Id.* at 587.

Among the various activities that may be indicative of a drug transaction, the Seventh Circuit has further noted that circuitous driving and other countersurveillance measures play a central role. For example, in *United States v. Garza-Hernandez*, 623 F.2d 496 (7th Cir. 1980), the Seventh Circuit held that officers had probable cause to support a warrantless search of a defendant's car where they observed the defendant and other parties engage in "circuitous

driving" and use a "'car switch' technique" that a reasonable officer would recognize to be indicative of a drug transaction. *Id.* at 498–99. Although some additional facts enhanced the court's finding of probable cause (such as the transfer of a bag and the defendants' repeated trips to a certain car in a parking lot), the court emphasized that the officers' observation of circuitous driving was "the single most important factor" underlying the existence of probable cause. *Id.* at 499. Subsequent case law has similarly emphasized that such countersurveillance measures contribute significantly to probable cause determinations. *See, e.g.*, *United States v. Carrillo*, 269 F.3d 761, 767 (7th Cir. 2001) (noting that circuitous driving is "a proper consideration in determining whether probable cause exists"); *United States v. Marin*, 761 F.2d 426, 432 (7th Cir. 1985) (noting that circuitous driving contributed to probable cause to believe that a narcotics-related crime was underway).

Here, as in *Funches* and *Garza-Hernandez*, agents had probable cause to conduct a search of Aguirre's vehicle because they observed Aguirre engaging in activities indicative of a drug transaction. As an initial matter, the agents had reason to be alert for signs of criminal activity because of their preexisting suspicions that Guzman and Salazar were involved in drug trafficking. These suspicions were based on Guzman and Salazar's misrepresentations to law enforcement officers during the traffic stop in December 2015, Guzman and Salazar's presence in Elmhurst despite their claim that they had been traveling to Mexico from the car auction in Harvey, and the fact that Guzman had previously been stopped in a vehicle that was suspected to have a modified gas tank. Furthermore, Aguirre's actions during his meeting with Guzman and Salazar indicated that criminal activity was likely afoot. After Aguirre parked his SUV behind Guzman and Salazar's pickup, agents on the surveillance team saw Aguirre and Guzman swap places and drive away in separate directions. The pickup then proceeded to engage in circuitous

driving in the area near the meeting location. Officers with significant experience in narcotics investigations testified that this circuitous driving appeared to be a means of performing countersurveillance that is sometimes used by narcotics traffickers. After ten or fifteen minutes of circuitous driving, the pickup returned to the original meeting location, and Aguirre then re-swapped places with Guzman.

The two car swaps, taken alongside the pickup truck's apparent performance of countersurveillance and the context of the underlying investigation into Guzman and Salazar, were sufficient to establish probable cause to believe that Aguirre, Guzman, and Salazar were attempting to evade detection while conducting a drug-related transaction. *See Funches*, 623 F.2d at 586–87; *Garza-Hernandez*, 623 F.2d at 498–99. Indeed, there does not appear to be (and Aguirre has not posited) an innocent explanation for such unusual behavior.[11] *See Funches*, 623 F.2d at 587. Furthermore, agents observed Aguirre transferring an item concealed in a bag when he exited the SUV to swap places with Guzman. *See id.* (noting that apparent exchange of concealed goods contributed to finding of probable cause). Given all of this information, a reasonably prudent law enforcement officer—and especially an officer with experience in investigating narcotics transactions, like the agents in this case—would have probable cause to believe that Aguirre was in the process of committing a drug-related crime and that contraband or evidence of the crime would be found in Aguirre's vehicle.

---

[11] Aguirre asserts in his motion that, "for all the agents in this case knew, Mr. Aguirre could have been an innocent acquaintance [of] Guzman and Salazar." Def.'s Mot. at 19. But this conclusory assertion does nothing to provide an innocent explanation for the two car swaps or the pickup's circuitous route.

Aguirre advances several arguments in support of his contention that the agents nevertheless lacked probable cause to support their search.[12] First, he emphasizes that, prior to the search, none of the agents on the surveillance team had actual knowledge as to whether he— or, for that matter, Guzman and Salazar—had ever been in possession of any narcotics. Def.'s Mot. at 16, 19. Be that as it may, this point is of no moment. It is well established that the probable cause inquiry focuses on what law enforcement officers knew at the time of the search, not on what they did not know. *See Richards*, 719 F.3d at 755 (quoting *United States v. Slone*, 636 F.3d 845, 849 (7th Cir. 2011)) ("[O]ne can always point out informational gaps, [and] the probable cause inquiry asks what a law enforcement officer knew rather than what he did not."). Although direct knowledge that Aguirre, Guzman, or Salazar had been in possession of narcotics certainly would have made the parties' meeting even more suspicious than it already was, the absence of such knowledge "does not lessen the probable cause generated by the highly unusual approach" that characterized the parties' encounter with one another. *Id.*

In support of his position that agents lacked probable cause, Aguirre also relies upon *United States v. Wilbourn*, 799 F.3d 900 (7th Cir. 2015), and *United States v. Ingrao*, 897 F.2d 860 (7th Cir. 1990). Both of these cases, however, are distinguishable from the facts at hand. In

---

[12]     At times, Aguirre appears to frame these arguments in terms of whether agents had probable cause to conduct a warrantless arrest, rather than whether agents had probable cause to conduct a warrantless search of his vehicle. *See* Def.'s Mot. at 11, 19. To the extent Aguirre intends to argue that he was unlawfully arrested prior to the search, the Court rejects this argument. First, the uncontroverted evidence presented at the hearing shows that Aguirre was arrested and physically restrained only *after* Officer Palos had searched the SUV and found the buckets of cocaine. Moreover, the stop of Aguirre's vehicle and Officer Palos's interactions with Aguirre prior to the search did not amount to a *de facto* arrest, because Officer Palos's questions, statements, and behavior toward Aguirre remained well within the bounds of a traditional investigatory stop. *See United States v. Bullock*, 632 F.3d 1004, 1016 (7th Cir. 2011) (discussing distinctions between an investigatory stop and a *de facto* arrest). In fact, in other cases, investigatory stops involving much more aggressive police techniques than are at issue here have been held to fall short of *de facto* arrests. *See id.* (collecting cases in which investigatory stops did not become *de facto* arrests even where officers "us[ed] handcuffs, plac[ed] suspects in police cars, dr[ew] weapons, or [used] other measures of force").

*Wilbourn*, the Seventh Circuit held that officers lacked probable cause or reasonable suspicion to stop and search a vehicle where the officers knew no information about the vehicle's occupants and had not received any such information from other officers. 799 F.3d at 909–10. And in *Ingrao*, the Seventh Circuit held that officers did not have probable cause to search the defendant's vehicle based merely upon the officers' observation that the defendant had been carrying a bag while walking through a gangway where a suspected drug transaction had taken place. 897 F.2d at 863–66. Here, by contrast, agents observed Aguirre himself engage in conduct indicating that a drug transaction was likely underway. Furthermore, at the time they stopped and searched Aguirre's vehicle, Agent Conrad and Officer Palos had knowledge of these facts based on both their own observations as well as information communicated from other members of the surveillance team. *See, e.g.*, *United States v. Lenoir*, 318 F.3d 725, 728 (7th Cir. 2003) ("When law enforcement officers are in communication regarding a suspect . . . the knowledge of one officer can be imputed to the other officers under the collective knowledge doctrine."). As such, Aguirre's reliance on *Wilbourn* and *Ingrao* is misplaced.[13]

For all of the foregoing reasons, the Court concludes that Agent Conrad and Officer Palos had probable cause to search Aguirre's vehicle under the automobile exception to the Fourth Amendment's warrant requirement. Thus, even if Aguirre had not consented to the search, the search nonetheless would not have violated his Fourth Amendment rights. Aguirre therefore is not entitled to suppression of the physical evidence of the cocaine found during the search.

_____

[13] Aguirre also points to dicta from *United States v. Slone*, 636 F.3d 845 (7th Cir. 2011), in support of his motion. *See* Def.'s Mot. at 16 (citing *Slone*, 636 F.3d at 849). For the same reasons that the Court is unpersuaded by Aguirre's reliance on *Ingrao*, it is unpersuaded by his reliance on *Slone*. *Compare Ingrao*, 897 F.2d at 863–66 (finding no probable cause to believe defendant was engaged in criminal activity where he merely "carried a bag down a gangway previously used in a suspicious transaction and furtively looked around"), *with Slone*, 636 F.3d at 849 (noting that officers' observation of defendant's vehicle exiting the location of a drug warehouse behind a second vehicle would not alone give rise to probable cause to search defendant's vehicle).

## II.     Motion to Suppress Post-Arrest Statements

Next, Aguirre seeks to suppress evidence of all written and oral statements he gave to law enforcement agents after his arrest.  In support, he argues that these statements should be suppressed because they were improperly elicited by an officer's false promise to "speak to the judge in this case" and were thus given involuntarily.  *See* Def.'s Mot. at 19.

Under the Fourteenth Amendment's Due Process Clause,[14] "[a] district court may admit a confession into evidence only if the accused made it voluntarily."  *United States v. Huerta*, 239 F.3d 865, 871 (7th Cir. 2001); *accord United States v. Williams*, 128 F.3d 1128, 1131 (7th Cir. 1997).  "A confession is voluntary and admissible if, in the totality of circumstances, it is the product of a rational intellect and free will and not the result of physical abuse, psychological intimidation, or deceptive interrogation tactics that have overcome the defendant's free will."  *Stadfeld*, 689 F.3d at 709 (internal quotation marks omitted); *accord United States v. Montgomery*, 555 F.3d 623, 629 (7th Cir. 2009).  In determining whether a confession or other statement was made voluntarily, courts consider factors such as "whether the defendant was read his *Miranda* rights, the defendant's age, the duration and nature of the questioning, and whether the defendant was punished physically."  *United States v. Charles*, 476 F.3d 492, 497 (7th Cir. 2007) (internal quotation marks omitted).  The government bears the burden of proving the voluntariness of the defendant's statements by a preponderance of the evidence.  *United States v. Villalpando*, 588 F.3d 1124, 1129 (7th Cir. 2009).

---

[14]     In his motion, Aguirre characterizes his arguments regarding his post-arrest statements as rooted in the Fifth Amendment.  *See* Def.'s Mot. at 19.  Case law suggests, however, that his arguments are more properly characterized as stemming from the Fourteenth Amendment's Due Process Clause.  *See, e.g.*, *United States v. Stadfeld*, 689 F.3d 705, 709 (7th Cir. 2012) (internal quotation marks omitted) (describing false promises of leniency as coercive police conduct that render a confession "not voluntary within the meaning of the Due Process Clause of the Fourteenth Amendment"); *see also Colorado v. Connelly*, 479 U.S. 157, 163–67 (1986) (describing the Supreme Court's involuntary confession jurisprudence as stemming from due process considerations under the Fourteenth Amendment).

A false promise of leniency may be so coercive as to render a defendant's statement involuntary. *See id.* at 1128; *Montgomery*, 555 F.3d at 629. But not all promises rise to this level of coerciveness. Instead, a promise renders a statement involuntary only if the promise is "materially false and thus sufficient to overbear [the defendant's] free will." *Villalpando*, 588 F.3d at 1128. In applying this rule, the Seventh Circuit has held that promises "to bring cooperation by the defendant to the attention of prosecutors do not render a confession involuntary." *Charles*, 476 F.3d at 497 (collecting cases). In addition, the Seventh Circuit has noted that an officer's promise to intercede on the defendant's behalf is less likely to render a confession involuntary than a promise that such an intercession will actually be effective. *Villalpando*, 588 F.3d at 1129–30.

After considering the evidence in this case, the Court finds that Aguirre's written and oral statements to law enforcement officers were made voluntarily. First, as Agent Conrad and Officer Palos testified (and as Aguirre admits in his affidavit, *see* Aguirre Aff. ¶ 16), Aguirre was read his *Miranda* rights before making any statements. Furthermore, nothing in the record suggests that Aguirre's age or intelligence hindered his ability to make his statements voluntarily, or that he was physically coerced or otherwise threatened into making the statements. Finally, the record shows that Aguirre made his statements no later than 8:38 a.m. on January 28, 2016, within two and a half hours after he was initially stopped. Taken as a whole, these circumstances show that Aguirre's post-arrest statements were made voluntarily. *See, e.g.*, *United States v. Murdock*, 491 F.3d 694, 699 (7th Cir. 2007) (holding that defendant's confession was voluntary where nothing in the record indicated that defendant was detained for an unduly long period of time or was psychologically coerced); *Huerta*, 239 F.3d at 872 (holding

that defendant's confession was not involuntary even though she confessed after being detained for eleven hours).

In addition, Aguirre's post-arrest statements were not rendered involuntary by a false promise of leniency from a law enforcement officer. First, according to Officer Palos's testimony, the only statement he made to Aguirre that resembled a promise of leniency was his statement that he would advise the state's attorneys of Aguirre's cooperation with law enforcement. Aguirre's affidavit contradicts this testimony, asserting that an officer promised Aguirre that he would "talk to the judge" if Aguirre signed the consent form. Aguirre Aff. ¶ 19. For the same reasons discussed above, however, the Court finds Officer Palos's testimony to be more reliable than Aguirre's short, self-serving affidavit. In particular, Officer Palos's tone and demeanor during the evidentiary hearing, the overall consistency of his testimony with the testimony of Agent Conrad, and the specificity with which he described the interactions in question all contributed to Officer Palos's credibility as a witness. *Cf. Sandoval-Vasquez*, 435 F.3d at 744–45. The Court therefore credits Officer Palos's testimony that he promised only to advise the state's attorneys of Aguirre's cooperation, and such promises are insufficient to render a defendant's statements involuntary. *See, e.g.*, *Charles*, 476 F.3d at 497 ("[P]romises to seek favorable consideration from the prosecutor do not undermine the voluntariness of a confession."); *United States v. Westbrook*, 125 F.3d 996, 1005 (7th Cir. 1997) ("An officer's statement or promise to a defendant that the prosecutor would be told of the defendant's cooperation does not transform a defendant's otherwise voluntary statement into an involuntary one.").

What is more, even if the Court were to instead credit Aguirre's claim that an officer promised to "talk to the judge" if he signed the consent form, the Court would still conclude

that Aguirre's post-arrest statements were made voluntarily. An officer's promise to "talk to the judge," presumably as a means of recommending leniency in exchange for the defendant's cooperation, is no more likely to render a person incapable of exercising his own free will than is a promise to seek favorable consideration from a prosecutor. *Cf. Charles*, 476 F.3d at 497–98. This is all the more so where, as here, the officer does not additionally guarantee that talking to the judge will actually succeed in benefiting the defendant. *See Villalpando*, 588 F.3d at 1129–30.

For these reasons, the Court finds that, given the totality of the circumstances, Aguirre's post-arrest statements were made voluntarily. In particular, the Court concludes that the statements were not given involuntarily or otherwise improperly elicited as a result of an officer's false promise. The Court accordingly denies Aguirre's motion to suppress his post-arrest statements.

## Conclusion

For the reasons stated herein, Aguirre's motion to suppress [26] is denied.

**IT IS SO ORDERED.**        **ENTERED**   7/5/17

_____
**John Z. Lee**
**United States District Judge**